JOHN S. BUCKINGHAM AND MARK BUCKINGHAM, APPELLANTS, v. NATHANIEL C. McLEAN, ASSIGNEE IN BANKRUPTCY OF JOHN MAHARD, JR.

Where a bill in chancery was filed by the assignee of a bankrupt, claiming certain shares of bank stock, the same being also claimed by the bank and by other persons who were all made defendants, and the answer of the bank set forth apparently valid titles to the stock, which were not impeached by the complainant in the subsequent proceedings in the cause, nor impeached by the other defendants, the circuit court decreed correctly in confirming the title of the bank.

Buckingham et al. *v.* McLean.

A power of attorney to confess a judgment is a security within the second section of the Bankrupt Act, 5 Stat. at Large, 442.

And this security is void if given by the debtor in contemplation of bankruptcy. But by these terms is meant an act of bankruptcy on an application by himself to be decreed a bankrupt, and not a mere state of insolvency.

In this case there is evidence enough to show that the debtor contemplated a legal bankruptcy when the power of attorney was given,

It is not usury in a bank which has power by its charter to deal in exchange, to charge the market rates of exchange upon time bills.

This was an appeal from the Circuit Court of the United States for the District of Ohio, sitting as a court of equity.

On the 27th of May, 1842, John Mahard, Jr., filed his petition in bankruptcy, and on the 20th of July, 1842, was declared a bankrupt.

Nathaniel C. McLean was appointed his assignee in bankruptcy.

John Mahard had been transacting business at Cincinnati with his brother, William Mahard, under the firm of J. & W. Mahard, and at New Orleans, under the firm of Mahard & Brother.

On the 12th of August, 1842, William Mahard filed his petition in bankruptcy.

On the 5th of January, 1843, McLean filed his bill in the Circuit Court against a great number of persons, who had outstanding liens on the property of John Mahard, Jr., at the time of his filing his petition in bankruptcy. They were,

The President, Directors, and Company of the Lafayette Bank of Cincinnati; the President, Directors, and Company of the Northern Bank of Kentucky; Andrew Johnson; John S. Buckingham; Mark Buckingham; the Ohio Life Insurance and Trust Company; the President, Directors, and Company of the Bank of the United States, incorporated by the State of Pennsylvania; the President, Directors, and Company of the Commercial Bank of Cincinnati; the President, Directors, and Company of the Franklin Bank of Cincinnati; James Dundas, Mordecai D. Lewis, Samuel W. Jones, Robert L. Pitfield, and Robert Howell, assignees, &c.; John Mahard, Sen., John McLaughlin, George Milne, and James Keith, partners, doing business in the firm name of Geo. Milne & Co., Charles B. Dyer, Frederick Trow, John C. Avery, late sheriff, and John H. Gerard, present sheriff of Hamilton county.

The assignee, McLean, enjoined proceedings in the State courts where the parties were prosecuting their several liens, and brought all matters connected with the bankrupts into the Circuit Court of the United States.

In the progress of the cause, a number of collateral matters were brought into the case; but the facts upon which the questions arose before this court are stated in the opinion, to which the reader is referred.

It was argued by *Mr. Read*, for the Buckinghams, and by *Mr. Chase* and *Mr. Rockwell*, for the Lafayette Bank, the Franklin Bank of Cincinnati, and the Northern Bank of Kentucky. . The interest of these banks was drawn in question by the third point raised by *Mr. Read*, who contended that the notes, bills and mortgages held by them, were void on account of usury.

*Mr. Read* made the following points, viz.:

1st. The forty-nine shares of stock should have been decreed to the Buckinghams, and not to the bank.

2d. That the judgment, execution, and levy of the Buckinghams were valid; the fruits of the sale should have been decreed to them, and not to the assignee as general assets.

3d. That the notes, bills, and mortgages of the said banks were void, having been discounted at higher rates of interest than were permitted by their charters, and the mortgages were given to secure such discounts or notes substituted therefor.

1. As to the forty-nine shares of bank stock.

In her answer, the Lafayette Bank contends that she held this stock of John Mahard as collateral security to pay the amount of $15,000, secured by mortgage on real estate, and also on general lien under her charter as security for general debts.

The bank, before the master, claimed the right to apply the stock to pay unsecured debts under her charter lien.

On the 13th of April, 1842, on the same piece of paper on which the stock had been assigned to the bank, was an assignment to Buckingham in these words:

" The forty-nine shares of the stock are transferred to John S. Buckingham, for value received."

*Point.* A party having a lien or other interest in property, standing by and permitting it to be sold without notice or assenting to its sale, loses all right in said property.

2. That if general creditors have an interest in such property, and the first lien-holder parts with his lien by consenting to its transfer, and such transfer is void by operation of law, the lien of the first holder does not reattach, but the property stands as general assets for the benefit of all creditors.

2d. As to the $1,300 made on Buckingham's execution.

It may be laid out of view that the Mahards did any act in creating liens or a cognovit, in contemplation of bankruptcy, as all the parties in their answers deny it.

On the 7th of April, 1842, John Mahard executed a power of attorney to confess judgment in favor of John S. Buckingham for $14,000, which was done the next day in the Supreme Court of the State of Ohio. Execution issued 20th of April, 1842; levy made upon real estate and certain personal property; which latter sold for $1,300.

John Mahard petitioned to be declared a bankrupt, 27th May, 1842.

Cognovit and judgment within two months prior to petition, held, therefore, void under the second section of the bankrupt act.

*Point 1st.* The second section of the Bankrupt act does not embrace in its terms, or by necessary implication, powers of attorney to *bonâ fide* creditors to confess judgment. Bankrupt act, 19th August, 1841.

2d. The power of attorney gives no lien or preference, but the judgments, by operation of law, and not the act of the bankrupt.

In the matter of Allen, 5 Law Rep. 362; Wakeman *v.* Hoyt, 5 Law Rep. 309; Downer et al. *v.* Brackett et al., 5 Law Rep. 394; 1 Bac. Ab. 628; Foster, ex parte, 5 Law Rep. 55.

3d. As to the invalidity of notes, bills, and mortgages of the banks, it is conceded that these banks could deal in exchange at fair and usual rates; but their charters did not authorize them to discount, by way of loan, at higher rates of interest than six per cent. in advance. If a bank or moneyed corporation exceeds its powers in exacting interest on discounts and loans at higher rates than permitted by their charter, all notes thus discounted and loans made are void, and all mortgages and pledges to secure payment are void also. Bank of Chillicothe *v.* Paddleford et al. 8 Ohio R. 257; Creed *v.* Commercial Bank, 11 Ohio R. 493; Miami Exporting Co. *v.* Clark, 13 Ohio, R. 18.

Banks may charge fair rate of exchange. Andrews *v.* Pond, 13 Peters, 65.

Difference between sale and a discount. Sale at any price, discount only at legal rates. A loan, if seller bound to pay if obligee does not. Comyn on Usury, Add. 287, 5 Law Lib.; Rex *v.* Ridge, 4 Price, 50; 2 Eng. Ex. Rep. 30; Byles on Bills, 72; Lee, ex parte, 1 Peere Wms. 782; Eden on Bankruptcy, 145; 7 Wend. 578; Ketchum *v.* Barber, 4 Hill, 244; Rapelye *v.* Anderson, 4 Hill, 476; Rice *v.* Mather, 3 Wend. 62; Yankey *v.* Lockheart, 4 J. J. Marshall, 276; Knights *v.* Putnam, 3 Pick. 184, 187; 12 Pick. 565; 4 Mass. 156; Powell *v.* Waters, 17 Johns. R. 176; 15 Johns. 44; 7 Wend. 569; 4 Hill, 476; 2 Johns. Cases, 60; 3 Johns. Cases, 66; 3 McCord, 365; 2 Cowen, 675; 7 Peters, 103, 109; 3 Cranch, 180; 1 Peters, 37; 4 Peters, 205; 2 Strange, 1243; 7 Wend. 633, 642; 8 Cowen, 669.

Lex loci, or place of performance to fix rate. Story on Bills, sect. 148.

Excessive exchange or commission on collection, or discounting depreciated paper, whereby higher rates than legal interest

is obtained, will be deemed usurious.    Hewson, ex parte, 1
Madd. 112 ; .7 Wend. 581 – 582 ; 13 Johns.·47 ; 1 Leigh, N. P.,
482 ; 4 Hill, 219, 229 ;  Comyn on Usury, 134.

Exchange charged on bill payable in a place where the money
will be as valuable as at place of discount, a shift or device to
exact over six per cent., charge of attorneys' fees, &c. ·  Miami
Ex. Co. v.  Clark, 13 Ohio R. 1 ;  Chitty on Bills, 89, (a), note ;
State v. Taylor, 10 Ohio R. 381 ;  Shelton v. Gill, 11 Ohio R.
418 ;  Spaulding v. Bank of Muskingum, 12 Ohio R. 544 ;  Creed
v. Com. Bank, 11 Ohio, 495.

Discounter must show the charge to be well· founded.; ex-
pense of collecting compensated by way of exchange ;. the usage
of banks cannot control the law.  8 Bac. Ab. 424 ;  Bank United
States v. Davis, 2  Hill, 452 ; 13 Johns. 47 ; 16 Johns. 375 ; 9
Mass. 49 ; 3 Bos. & Pul. 154.

True differences only are to be charged.    Merritt v. Benton,
10 Wend. 116 ; 2 Hill, 640 ; 2 Hill, 452 ; 7 Wend. 581.

No such thing as time exchange.    McCullough, "Exchange;"
Story on Bills, p. 481.

Discounted in depreciated paper, to be paid in silver, usuri-
ous.    United States Bank v. Owens, 2 Peters, 527 ;  United
States Bank v. Waggener, 9 Peters, 378 ; 1 Peters, 44 ; 2 Harris
& Gill, 13 ; 1 J. J. Marshall, 47 ; 2 Hill, 499 ; 1 Hall, 519.

Unreasonable charge for commission, or improbable difference
of exchange.    Hine v. Handy, 1 Johns. Ch. 6 ;  Dunham v. Dey,
13 Johns. 47 ; 7 Wend. 581 – 582 ; 16 Johns. 375.

Risk of making place of payment only to be charged as ex-
change.    4 Hill, 221 ; 4 Hill, 250 ; 2 Paige, 272, 275.

Bank's charge according to length of time an artifice.    4 Hill,
480 ; 10 Ohio R. 381.

Mortgages in Ohio but a security.    Lessee of Perkins v.
Dibble, 10 Ohio R. 439 ;  Moore v. Burnet, 11 Ohio R. 341 ;
4 Kent, Com. 195, 5th ed. ; 21 Wend. 485 ; 26 Wend. 555.

Usury defeats a mortgage.  3 Pow. on Mort. 896, note.

Substituted securities void, taint of usury follows.  Chit. on
Bills, 89 ; Walker. v. Bank of Washington, 3 How. 72.

All the discounts of these banks were on time bills ; sight
bills at par ; exchange from $1\frac{1}{2}$ to $2\frac{1}{2}$ per cent.

· *Mr. Chase* and *Mr. Rockwell* made the following points.

I. The mortgage to the Lafayette· Bank was made more
than two months before the filing of the bankrupt petition, and
was· not made in contemplation of bankruptcy, in violation of
the provisions of the Bankrupt act.

Answer of Lafayette Bank, p. 48 : " And these respondents,
further answering, deny that said mortgage was executed by

said John in contemplation of bankruptcy, or that he was known or considered to be in a state of insolvency ; but these respondents had good reason to believe, and did believe, that said John was solvent, and fully able to pay all his debts, and therefore they agreed to give, and did give him time to enable him the more readily to pay the said debts then due to these respondents. Respondents insist that said John Mahard, Jr., did not contemplate bankruptcy at the time of the execution of said mortgage, but that he executed and delivered the same in good faith, to secure a *bonâ fide* debt then due to these respondents as aforesaid.

"And these respondents further answering, state, that said mortgage was executed, delivered, and recorded more than sixty days before the filing of said petition by said John Mahard, Jr., for the benefit of said act, and that the transaction between said Mahard and these respondents was in good faith ; and if the said John Mahard (which they deny) had it in contemplation, at the time of executing said mortgage, to take the benefit of said act, these respondents had no notice of such intention, either express or implied, and their mortgage is not affected by any subsequent proceedings in bankruptcy," &c.

The cases decided by the English courts under the statute of 1 Jac., c. 15, if applicable to the United States Bankrupt act, do not sustain the doctrine that a conveyance made by an insolvent person is to be considered as a conveyance in contemplation of bankruptcy.

The 2d section of that statute provided that every person using the trade of merchandise who should "make, or cause to be made, any fraudulent conveyance of his lands, tenements, goods, or chattels, to the intent, or whereby his creditors shall, or may be defeated or delayed, for the recovery of their just and true debts, shall be accompted and adjudged a bankrupt."

Gibbs, C. J., in Fidgeon *v*. Sharpe, 5 Taunt. 541, said : "With respect to this doctrine of contemplation in cases of bankruptcy, we have nothing either in the common or statute law to show what it is. The cases in which this doctrine was introduced made it depend upon the *quo animo*."

In Morgan *v*. Brundrett, 5 Barn. & Adol. 297, Patteson, J., says : "The recent cases have gone too great a length. They seem to have proceeded on the principle, that if a party be insolvent at the time he makes payment or a delivery, and afterwards he become bankrupt, he must be deemed to have contemplated bankruptcy at the time when he made such payment ; but I think that is incorrect ; for a man may be insolvent and yet not contemplate bankruptcy."

And Parke, J., says : "The meaning of those words," (in

contemplation of bankruptcy,) " I take to be that the payment or delivery must be with intent to defeat the general distribu·· tion of effects which takes place under a commission of bankruptcy. It is not sufficient that it should be made (as may be inferred from some of the late cases) in contemplation of insolvency. These cases I think have gone too far."

Gibbs, C. J., in Fidgeon *v.* Sharpe, 5 Taunt. 545, lays down the correct rule. See it quoted, 8 Met. 385. See also, Hartshorn *v.* Slodden, 2 Bos. & Pul. 582; Gibbins *v.* Phillipps, 7 Barn. & Cres. 529; Atkinson *v.* Brindall, 2 Bing. N. R. 225; 2 Scott, 369; Belcher *v.* Prittie, 10 Bing. 408.

The statute of Jac. 1 has been modified by recent enactments.

By the 12th sect. of 2 & 3 Vict. c. 11, it is provided that " all conveyances by any bankrupt *bonâ fide* executed, before the issuing any fiat of bankruptcy, shall be valid, notwithstanding any prior act of bankruptcy by him committed, provided the person to whom such bankrupt so conveyed had not at the time of such conveyance notice of such act."

And the 1st sect. of the 2 & 3 Vict. c. 29, after reciting 6 Geo. 4, c. 16, sect. 81, and 2 & 3 Vict. c. 11, sect. 12, enacts, " That all contracts, dealings, and transactions, by and with any bankrupt, really and *bonâ fide* made and entered into before the date and issuing of the fiat against him, and all executions and attachments against the lands and tenements, or goods and chattels of such bankrupt, *bonâ fide* executed or levied before the date, &c., of the fiat, shall be deemed to be valid, notwithstanding any act of bankruptcy; provided also, that nothing herein contained shall be deemed to give validity to any payment, &c., of any bankrupt, being a fraudulent preference of any creditor."

The following American cases give the construction of the United States Bankrupt act upon this point : —

In the matter of Rowell, Mr. Justice Prentiss, of the United States District Court of Vermont, 21 Vt. R. 625, says : " What constitutes such a preference is a question concerning which there are conflicting authorities ; but the prevailing dictum seems to be, that a payment, when it consists of a part only of the debtor's property, must be made in contemplation of bankruptcy, and must be voluntary. Both must concur. If it be in contemplation of bankruptcy, but not voluntary, or be voluntary and not in contemplation of bankruptcy, something more must appear than mere insolvency ; enough to show, if not a determination to become a bankrupt, at least that bankruptcy was in view as a consequence of the insolvency ; and to be voluntary, the payment must originate with the debtor, the first step being taken by him and not by the creditor."

Gassett et al. v. Morse et al. United States District Court of Vermont, 21 Vt. R. 627, where in relation to the proviso as to conveyances made more than two months before, &c., Prentiss, J., (p. 633) says: "It cannot reasonably be taken to have any other effect than merely to give validity to a transaction *bonâ fide* entered into more than two months before the filing of the bill, so far as it concerns the party dealing with the bankrupt. It cannot be understood as giving any protection to the bankrupt himself, either on the question of bankruptcy, or on the question of his right to a discharge. If the transaction be fraudulent on his part, why should he not be deemed a bankrupt or denied a discharge, as the case may be, though the rights of the party under the transaction, who may be an innocent party, should remain unaffected?"

In the matter of Pearce, 6 Law Rep., 261, Judge Prentiss held "that it is not a necessary and legal inference that a conveyance was made in contemplation of bankruptcy, merely because the debtor was insolvent at the time ; but it must appear that the conveyance was made by the debtor in anticipation of failing in his business, of committing an act of bankruptcy, or of being declared bankrupt at his own instance, and intending to defeat the general distribution of his effects."

In Ashby v. Steere, 2 Woodb. & Minot's Rep. 347, Judge Woodbury examined all the cases on the subject, and says (p. 357) that "if a preference is made by the debtor without contemplating a subsequent resort to the law, the sale and preference are not void at all. Nor if made with such contemplation, though culpable in the debtor, is it invalid as to the creditor, unless he took the property with notice of what was contemplated, and thus designedly coöperated against the act, and did it within the short period of two months prior to the debtor's application for the benefit of the act."

Again, (pp. 357, 358,) "The law wisely considers it better that a preference of this kind, which is good at common law, and when the creditor does not know of the design of the debtor to go into bankruptcy, and does not coöperate to defeat the policy of that law, should not be disturbed as to the public, after two months as before named, than that such assets should go into a common fund for all creditors."

In Jones v. Howland, 8 Met. R., 377, per Hubbard, J., opinion of court, p. 387 : "The instruction requested by the counsel for the defendants was substantially correct. With some slight modification, it may be stated as follows : That if, on the 8th day of March, Stowell feared or believed himself to be insolvent, but did not contemplate stoppage or failure, and intended to keep on, making his payments and transacting his business, hoping that

his affairs might be afterwards retrieved; and in that state of mind made the sale or payment of that day without intend-ing to give a preference to the defendants, and as a measure connected with his going on in his business, and not as a measure preparatory to, or connected with, a stoppage in business; then the sale or payment on that day was not a sale or payment made in contemplation of bankruptcy within the meaning of the act."

And see Wilkinson's Appeal, 4 Barr, Penn. Rep. 284, 288, 289, where the court say, (referring to the cases of Wakeman v. Hoyt, 5 Law Rep. 306, and Arnold et al. v. Maynard, by Story, J., 5 Law Rep. 296,) " These last two decisions do not sustain the position that the confession of a judgment by a person, even deeply indebted and insolvent, constitutes of itself a fraud on the Bankrupt act, and is an act of bankruptcy, &c.

" We apprehend that to take the cause out of the saving clause, it is incumbent upon those who attempt to defeat its operation to show by satisfactory evidence that the act or dealings were not *bonâ fide*." Ibid. p. 290.

" This view of the case appears to be in conformity with the decisions of this court on the subject. Thus, in Haldeman v. Michael, 6 Watts & Serg. 128, it was ruled that a bond with warrant of attorney to confess judgment, which was given two months and twenty days before the petition to have the debtor declared a bankrupt was presented by his creditor, and on which a *fi. fa.* was issued on the same day the bond and warrant were given, was good and valid, and did not constitute an act of bankruptcy. Judge Hays says that the slightest solicitation on the part of a creditor will protect the transaction. ' Unless it clearly appears that the act originated with the debtor, and that he took the first step to make the transfer, it will not be deemed a fraudulent preference. And it is incumbent on the party who seeks to defeat the transaction to show that it was voluntary.' " Ibid. p. 291.

The case of McAllister v. Richards, 6 Barr, 133, does not vary this rule, and refers to the above case in 4 Barr, as containing the correct rule on the subject.

II. The debt of $15,000, secured by mortgage to the Lafayette Bank, was not an usurious or prohibited loan of money under the charter of the bank.

1. The interest charged upon this sum of $15,000 was only at the rate of 6 per cent. per annum, with no additional charge of any kind.

The amended bill charges that this loan was " at and for a rate of interest greater than at the rate of six per cent. per annum in advance."

This the answer positively denies. The respondents, in their answer say, " These respondents loaned to the said J. & W. Mahard the sum of $15,000, at Cincinnati, at or about the date of said mortgage, to enable them to take up a portion of the drafts on which they were liable, as already stated. These respondents have already stated that the first and only draft of said J. & W. Mahard not paid at maturity, to the knowledge of these respondents, was protested on the 18th November, 1841, but was arranged and taken up to the satisfaction of these respondents; all other drafts of said J. & W. Mahard were taken up by them as they became due at New Orleans, whether with the proceeds of the loan made by these respondents, as aforesaid, or not, these respondents have no positive knowledge; when the said drafts were paid, these respondents regarded the debt evidenced thereby as paid, and fully discharged and extinguished."

The answer further states, that when these notes for $15,000 were discounted, they " had then ninety-two days to run, and were to be received without reduction for one year; then one third to be paid, and so on, until final payment in three years; that the proceeds of said notes, reserving the sum of two hundred and thirty dollars, the interest for ninety-two days, were placed to the credit of said J. & W. Mahard."

The interest on $15,000 for ninety-two days, computing 365 days to the year, is just $230.78, so that the bank received seventy-eight cents less than the legal interest.

It is claimed that these notes were discounted in order to enable the Mahards to take up their drafts when they became due, and the transaction would be affected by any taint of usury which might be claimed to attach to the drafts.

These notes were in no sense a renewal of the drafts; they were not substituted for the drafts. The avails were passed to the credit of the Mahards. The drafts were all supposed to continue outstanding, and at their maturity were taken up at New Orleans, but whether with proceeds of these notes or not is not certain.

There was no pledge or legal appropriation of the avails of those notes to meet the drafts. Only one of the drafts was due when the notes were discounted.

2. In the discounting of the drafts there was no usury.

The charge made on the drafts, as shown in the answer to the amended bill, was interest at 6 per cent. on each. The exchange on the first was 1 per cent., and the other three 1½ per cent. The drafts were all at four months, on New Orleans.

The answer expressly states, " The exchange charged in each

case was the customary and regular rate at the time of the discounting of the bills ; and these respondents expressly deny that any illegal interest was taken or charged on said bills, or any of them."

It is the universal settled rule of law that a charge for exchange, unless used as a cover for usury, is legal and not usurious.

The case of Andrews v. Pond et al. 13 Pet. 65, contains a full statement and illustration of the rule on this subject.

The party in this case paid 10 per cent. damages on a protested bill, drawn on Alabama, in New York, and 10 per cent. interest and exchange on a new bill to be given, besides the expenses on the protested bill. The amount due on the first bill, 21st February, 1837, was $6,000. The amount of the new bill, including damages, interest, exchange, and expenses of protest, due on the 13th May, 1837, less than three months, was $7,287.78.

Per case, Taney, C. J., (p. 76) : " The transaction, taken altogether, was indeed a ruinous one on the part of the defendant. A debt of $6,000, payable at Mobile, on the 21st of February, was converted into a debt of $7,287.78, payable at the same place on the 25th of April, following; being an increase of $1,287.78 in the short space of eighty-one days. Yet, if the defendants brought it upon themselves by their failure to take up the first bill at maturity, and the transaction was not intended to cover usurious interest, they must meet the consequence of their own improvidence. The sum of $6,525.25 was undoubtedly due from them to H. Andrews & Co., on the day the bill in question was drawn. They were entitled to demand that sum in New York, or a bill that was equivalent to it at the market price of exchange; and, if ten per cent. discount was the usual price at which others purchased bills of this description in the market of New York, they had a right to take the bill at that rate in satisfaction of their debt."

Again, (p. 77) : " There is no rule of law fixing the rate which may be lawfully charged for exchange. It does not altogether depend upon the cost of transporting specie from one place to another, although the price of exchange is, no doubt, influenced by it. But it is also materially affected by the state of trade, by the urgency of the demand for remittances, and by the quantity brought into the market for sale; and sometimes material changes take place in a single day, although no alteration has happened in the expenses of transporting specie. The court, therefore, can lay down no rule on the subject."

The fact that bills on time are sold or discounted at a higher rate of exchange than sight bills, does not prove the transaction

14 *

to be usurious. Pilcher, Assignee, &c., v. The Banks, 7 B. Monroe, 548. See, also, 11 Ohio R. 417; 13 Pet. 65.

When there is a suspension of specie payment by the banks, the fact of a charge of a higher rate for time than for sight drafts does not even tend to show that there was any attempt to cover an usurious loan.

The rate of exchange, when the payment is to be made in specie at the place of payment, is, in the main, the expense, risk, &c., of the transportation of specie.

The rate charged on sight drafts, even if payable in specie, is not always the same as that on drafts on time. In one case, the rate has reference to the present known value of the funds at the place of payment; in the other, to the rate at the maturing of the paper.

When the banks have suspended specie payment, the ordinary certainty in such transactions ceases, and there is a marked difference between sight and time drafts.

The party buying or discounting drafts at a future time, acts in reference to the possible and uncertain state of things which may exist when his money is returned to him in a depreciated currency at a distant place. The soundness of the banks in whose paper the notes may be paid, the discount on the paper of those banks, the uncertainty attending commercial affairs, and the apprehension of future depreciation of bank paper, all form part of the consideration as to the rate of exchange.

The question is one not affecting the character of the draft or note offered for sale or discount, but the value of the funds at the place of payment where the same is paid.

When the draft is drawn at a place, where, from the suspension of banks, bank paper is the currency, upon a place where they have not suspended, and debts are paid in specie, the effect of this state of things is apparent.

A draft drawn on London at New York, when the banks of New York suspended specie payment, would be sold at a premium, which would represent, not only the real state of exchanges between the two countries, but the difference in the value between gold and silver and the market value of the depreciated currency.

And *vice versâ*, a draft sold at London on New York, would be in the same manner at a heavy discount. If such draft was drawn on time, however abundant money might be in London, and however low the rate of interest, or however unquestionable the character of the paper offered, the rate of exchange charged would be much higher than on a sight draft, on account of the uncertainty of the value of the depreciated currency in which the debt was to be paid.

For these reasons it might well be that at the same time that drafts on New Orleans at Cincinnati were at a discount, similar drafts at New Orleans on Cincinnati might be at a similar discount. Because men would prefer to have their money returned to them, at the maturity of the paper, in the paper of the banks known to them and at home, in preference to that of banks unknown to them and at a distance. This would not apply to specie, the value of which is known and uniform.

3. If usurious interest were taken by the bank, by the general principle of equity, a party seeking relief must pay the principal and legal interest, and, by the settled law of Ohio, the contract is void only for the excess of interest.

Lord Thurlow, in Scott *v.* Nesbit, 2 Bro. 641; 2 Cox, 183, said: " I take it to be an universal rule that if it be necessary for you to come into this court to displace a judgment at law, you must do it on the equitable terms of paying the principal money due with lawful interest."

" It is the fundamental doctrine of the court, that in case of usury equity suffers the party to the illicit contract to have relief; but whoever brings a bill in case of usury, must submit to pay principal and interest due." Per Lord Hardwicke, 1 Vesey Sen. 320.

Lord Eldon, 3 Ves. & Bea. 14, says: " At law you must make out the charge of usury, and at equity you cannot come for relief, without offering to pay what is really due," &c.

Chancellor Kent, 5 Johns. Ch. R. 143, after citing the foregoing cases, says: " The equity cases speak one uniform language, and I do not know of a case in which relief has been afforded to a plaintiff, seeking relief against usury, by bill, upon any other terms." 1 Johns. Ch. R. 367; 3 Ves. & Bea. 14; 2 Ves. Jr. 138; 16 Ves. 124, n. 1; 2 Ves. Jr. 489; 2 Bro. C. R. 641; 1 Story, Eq. Jur., sect. 301, 302.

Mr. Justice CURTIS delivered the opinion of the court.

Nathaniel C. McLean, as the assignee of John Mahard, Jr., a bankrupt, filed his bill in the Circuit Court of the United States for the District of Ohio, for the purpose of relieving property of the bankrupt from incumbrances thereon, alleged to have been created in fraud of the Bankrupt act. A final decree having been entered in the cause, John S. Buckingham and Mark Buckingham, parties defendant to the bill, have prosecuted this appeal.

They allege that the decree of the Circuit Court was erroneous in three particulars.

The first is, that the title of John S. Buckingham to forty-nine shares of the stock of the Lafayette Bank has been declared

to be subject to an incumbrance thereon in favor of the bank, whereas John S. Buckingham had the better title thereto.

The amended bill states " that said Mahard, before and at the time of filing his petition to be declared bankrupt, was the owner of forty-nine shares, of one hundred dollars each, of the capital stock of the Lafayette Bank of Cincinnati; that the said Lafayette Bank and John S. Buckingham set up some claim to said forty-nine shares of stock, of the particular nature of which your petitioner is ignorant. And your petitioner charges, that neither said Lafayette Bank, nor John S. Buckingham, have any valid legal claim to said shares of stock, but that petitioner, assignee, &c., is justly entitled thereto."

The answer of the bank responds to this allegation in the bill " that said John Mahard was the owner of forty-nine shares of the capital stock of the bank of these respondents, on each of which the sum of one hundred dollars had been paid; that he became the owner of said shares, so far as these respondents are advised, on the 13th day of September, 1841, and afterwards transferred the same to the cashier of said bank, as collateral security for the debt of J. & W. Mahard to these respondents, and these respondents now claim to have the control of said shares in virtue of said transfer, and also in virtue of their lien upon the capital stock of said bank, owned by debtors to the same, which lien is created and confirmed by the charter granted to these respondents by the legislature of the State of Ohio."

John S. Buckingham and Mark Buckingham both demurred to this amendment of the bill. Their demurrer was overruled; but no answer to this particular allegation was filed by either of them; and the record contains no evidence, introduced by any party, touching the title to this stock. In this state of the record it is most manifest, only one decree could be made. The bank, in response to the allegations of the bill, having disclosed two titles to this stock, either of which was sufficient, if valid, and the assignee having shown nothing to impeach either title, his claim could not be allowed; and John S. Buckingham, being entirely silent respecting the charge in the bill, that he makes some claim to this stock, does, in effect, make none in this cause, and cannot complain of a decree for not awarding to him what he does not appear to have claimed.

The second objection made by the appellants to the decree is, that it declares their title to certain moneys, made by the levy of an execution, in their favor, on personal property of the bankrupts, to be invalid, as against the assignee.

On the 7th of April, 1842, a power of attorney to William M. Corry, Esq., to confess a judgment against the mercantile firm

of the bankrupts, in favor of John S. Buckingham, for the sum of fourteen thousand, eight hundred dollars, was executed by John Mahard, Jr., for himself and his copartner, William Mahard, who was at the time in New Orleans. By virtue of this power a judgment for that sum was confessed on the 8th of April. On the 20th of April, William Mahard, by an instrument under seal which recited the substance of this power, and that it was given with his concurrence, confirmed and ratified it as his act. On the 22d of May, 1842, execution was taken out and levied on personal property of the judgment debtors. On the 27th of May, 1842, John Mahard, Jr., filed his petition and was subsequently decreed a bankrupt thereon. The judgment, though confessed in favor of John S. Buckingham alone, was founded on a debt due to both the appellants, who were *bonâ fide* creditors of J. & W. Mahard.

The question is, whether these proceedings came within the second section of the Bankrupt Act, 5 Stat. at Large, 442. This section provides: " That all future payments, securities, conveyances, or transfers of property, or agreements, made, or given by any bankrupt, in contemplation of bankruptcy, and for the purpose of giving any creditor, indorser, surety, or other person any preference or priority over the general creditors of such bankrupt, shall be deemed utterly void, and a fraud upon this act.

By the law of Ohio, a judgment creates a lien on the real estate of the judgment debtor, and the levy of an execution creates one on his personal estate levied on. A power of attorney to confess a judgment, whenever a judgment is taken under it, does in fact operate to create a security upon the debtor's real estate ; and when an execution issues on that judgment, to create a lien on the personal estate levied on. It is true these liens arise by operation of law, from the judgment, and execution, and its levy, which are the acts of officers of the law, and not of the debtor. But the power of attorney is designed to, and does, produce those acts, which depend upon it for their validity, and therefore through those acts does create the security. The operation of law is always necessary to give effect to any form of security, which indeed is but the legal consequence of the act of the party ; and the lien created by a judgment is none the less the legal consequence of the act of the party, because it is necessary that after the power is executed, a judgment should be rendered. When it is rendered, the creditor has a security, by operation of law, through the act of the debtor, and therefore such a security may be correctly said, in the language of this section, to be made or given by the debtor.

If it were not so, one of the acts of bankruptcy, described in the first section of this statute, would make a valid title to the

creditor. It is an act of bankruptcy, for the debtor willingly to procure his goods or lands to be attached, distrained, sequestered, or taken on execution. It cannot be supposed that what was in itself an act of bankruptcy, and done for the purpose of giving a preference over the general creditors, was intended to be left valid, and effectual to defeat one of the two great objects of the law, which were to grant a discharge to honest debtors who should conform to its provisions, and to distribute their property ratably among all their creditors.

But if a judgment, confessed by the debtor through a power of attorney, be not a security given by him, there is nothing in this act which defeats a preference thus created, and the provisions of this second section become practically inoperative in respect to all property of the debtor which may be bound by a judgment, or even by the levy of an execution; since a speedy and well-known mode of preferring a creditor, by confessing a judgment, is left open to all debtors who may desire to give preferences, even in contemplation of bankruptcy. This consequence, while it would not justify a forced construction of the words used in the act, does certainly require that the utmost meaning and effect, fairly attributable to them, should be laid hold of to prevent so great a mischief.

The language employed in the English bankrupt acts shows that, under that system, a judgment is treated as a security. The 21 James 1, c. 19, § 9, uses the language "that, if any person have a security for his debt by judgment, statute," &c. The revising act, 6 Geo. 4, c. 16, § 108, provides that, "no creditor, having security for his debt, &c. shall receive more than a ratable part of such debt, except in respect to any execution or extent, served and levied by seizure upon, or any mortgage or lien upon, any part of the property of such bankrupt, before the bankruptcy." Thus classing judgments with mortgages, under the word securities. And the Irish Bankrupt Act, 11 & 12 Geo. 3, c. 8, § 5, enacted, that "nothing herein contained shall extend to any security by judgment, obtained before the bankrupt became a trader." Mr. Eden (Eden on Bankruptcy, 285,) remarks, concerning the difference in phraseology between the 21 James 1, and 6 Geo. 4, that the general term, security, employed by the latter, would necessarily include all the particulars enumerated in the old statute; that is, security necessarily includes judgments. In many of the States, a bond and warrant of attorney to enter up judgment is a usual mode of taking security for a debt, and judgments thus entered are treated as securities, and an equitable jurisdiction exercised over them by courts of law. In some States, they operate only as a lien on the lands of the debtor, in others, on his personal estate

also; Brown *v.* Clarke, 4 How. 4; and wherever, by the local law, a judgment or an execution operates to make a lien on property, we are of opinion it is to be deemed a security; and when rendered upon confession, under a power given by the debtor for that purpose, it is a security made or given by him within the meaning of the Bankrupt Act, and is void, if accompanied by the facts made necessary by that act to render securities void. These facts are, that the security was given " in contemplation of bankruptcy, and for the purpose of giving any creditor, indorser, surety, or other person, a preference or priority over the general creditors of such bankrupt."

The inquiry, whether this security was given in contemplation of bankruptcy, involves the question what is meant by those words. It is understood that, while the Bankrupt Law was in operation, different interpretations were placed upon them in different circuits. By some judges, they were held to mean contemplation of insolvency, — of a simple inability to pay, as debts should become payable, — whereby his business would be broken up; this was considered to be a state of bankruptcy. the contemplation of which was sufficient. By other judges, it was held, that the debtor must contemplate an act of bankruptcy, or a voluntary application for the bankrupt law. In re Pearce, 6 Law Rep. 261; In re Rowell, 6 Law Rep. 298; Jones *v.* Howland, 8 Met. R. 377; Taylor *v.* Whitehouse, 5 Humph. 340.

It is somewhat remarkable that this question should be presented for the first time for the decision of this court after the law has been so long repealed, and nearly all proceedings under it terminated. Perhaps the explanation may be found in the fact, that when securities have been given within two months before the presentation of a petition by or against the debtor, the evidence would usually bring the case within either interpretation of the law. However this may be, it is now presented for decision; and we are of opinion that, to render the security void, the debtor must have contemplated an act of bankruptcy, or an application by himself to be decreed a bankrupt.

Under the common law, conveyances by a debtor, to *bonâ fide* creditors, are valid, though the debtor has become insolvent and failed, and makes the conveyance for the sole purpose of giving a preference over his other creditors. This common-law right, it was the object of the second section of the act to restrain; but, at the same time, in so guarded a way as not to interfere with transactions consistent with the reasonable accomplishment of the objects of the act. To give to these words, contemplation of bankruptcy, a broad scope, and somewhat loose meaning, would not be in furtherance of the general purpose with which they were introduced.

The word bankruptcy occurs many times in this act. It is entitled "An act to establish a uniform system of bankruptcy." And the word is manifestly used in other parts of the law to describe a particular legal *status*, to be ascertained and declared by a judicial decree. It cannot be easily admitted that this very precise and definite term is used in this clause to signify something quite different. It is certainly true in point of fact, that, even a merchant may contemplate insolvency and the breaking up of his business, and yet not contemplate bankruptcy. He may confidently believe that his personal character, and the state of his affairs, and the disposition of his creditors, are such, that when they shall have examined into his condition they will extend the times of payment of their debts, and enable him to resume his business. A person, not a merchant, banker, &c., and consequently not liable to be proceeded against and made a bankrupt, though insolvent, may have come to a determination that he will not petition. The contemplation of one of these states, not being in fact the contemplation of the other, to say that both were included in a term which describes only one of them, would be a departure from sound principles of interpretation. Moreover, the provisos in this section tend to show what was the real meaning of this first enacting clause. The object of these provisos was, to protect *bonâ fide* dealings with the bankrupt, more than two months before the filing of the petition by or against him, provided the other party was ignorant of such an intent, on the part of the bankrupt, as made the security invalid under the first enacting clause. And the language is, "provided that the other party to any such dealings or transactions had no notice of a prior act of bankruptcy, or of the intention of the bankrupt to take the benefit of this act." These facts, of one of which a *bonâ fide* creditor must have notice, to render his security void, if taken more than two months before the filing of the petition, can hardly be supposed to be different from the facts which must exist to render the security void under the first clause; or, in other words, if it be enough for the debtor to contemplate a state of insolvency, it could hardly be required that the creditor should have notice of an act of bankruptcy, or an intention to take the benefit of the act. It would seem that notice to the creditor of what is sufficient to avoid the security, must deprive him of its benefits, and consequently, if he must have notice of something more than insolvency, something more than insolvency is required to render the security invalid; and that we may safely take this description of the facts which a creditor must have notice of to avoid the security, as descriptive, also, of what the bankrupt must contemplate to render it void.

In construing a similar clause in the English bankrupt law, there have been conflicting decisions. It has been held that contemplation of a state of insolvency was sufficient. Pulling v. Tucker, 4 B. & Ald. 382; Poland v. Glyn, 2 Dow. & Ry. 310. But both the earlier and later decisions were otherwise, and, in our judgment, they contain the sounder rule. Fidgeon v. Sharpe, 5 Taunt. 545; Hartshorn v. Slodden, 2 Bos. & Pul. 582; Gibbins v. Phillipps, 7 B. & C. 529; Belcher v. Prittie, 10 Bing. 408; Morgan v. Brundrett, 5 Barn. & Ad. 297. And see the opinion of Patteson, J., in the last case.

Considering, then, that it is necessary to show that the debtor contemplated an act of bankruptcy, or a decree adjudging him a bankrupt on his own petition, at what time in this case must he have had this in contemplation? He gave the power of attorney on the 7th of April; the judgment was confessed and entered up on the next day; the execution was taken out and levied, and the lien created thereby, on the 22d of May; and five days afterwards, being less than two months after the execution of the power, the debtor presented the petition under which he was decreed a bankrupt. The only act done by the debtor was the execution and delivery of the power of attorney. It was a security by him made or given, only by reason of that instrument. What followed were acts of the creditor and of officers of the law, with which the debtor is no more connected than with the delivery by a creditor of a deed to the office of the register, to be recorded, or the act of the register in recording it. It would seem that, if the intent of the debtor is to give a legal quality to a transaction, it must be an intent accompanying an act done by himself, and not an intent or purpose arising in his mind afterwards, while third persons are acting; and that, consequently, we must inquire whether the debtor contemplated bankruptcy when he executed the power. It is true, this construction would put it in the power of creditors, by taking a bond and warrant of attorney, while the debtor was solvent and did not contemplate bankruptcy, to enter up a judgment and issue execution, and by a levy acquire a valid lien, down to the very moment when the title of the assignee began. But this was undoubtedly so under the statute of James, which, like ours, contained no provision to meet this mischief; and it became so great that, by the 108th section of the revising act of 6 Geo. 4, it was enacted, that "no creditor, though for a valuable consideration, who shall sue out execution on any judgment obtained by default, confession, or nil dicit, shall avail himself of such execution, to the prejudice of other fair creditors, but shall be paid ratably with such creditors."

If the Bankrupt Act of 1841 had continued to exist, a

similar addition to its provisions would doubtless have become necessary.

It remains to inquire whether the debtor in this case, in point of fact, contemplated bankruptcy, and designed to give a preference to the appellants, when he executed the power on the 7th of April.

It has been stated at the bar that by some accident, much of the evidence bearing on this question was lost, and is not inserted in the record. We have no doubt of the fact; but this question must be decided here upon what remains; and we think there is sufficient now on the record to show that bankruptcy was in contemplation when the power was given. The petition to be decreed a bankrupt was filed only fifty days after the date of the power. No material change in the state of the debtor's affairs appears to have occurred between the 7th of April and the 27th of May. The only property which came into the hands of the assignee, uncovered by valid liens of particular creditors, was the thirteen hundred dollars made by this execution out of property already incumbered by a mortgage to another creditor, for the sum of upwards of fourteen thousand dollars, dated on the 18th of March preceding, and which has been adjudged by the Circuit Court to be void, under the second section of the Bankrupt Act, and no appeal taken.

- The bankrupt was a member of a mercantile firm, doing business in Cincinnati and New Orleans, and the commercial paper of this firm, to a very large amount, had been protested for nonpayment, and was known to the bankrupt to have been so, before this power was given. Holding an execution for $14,800, the appellants were able to make upon it only $1300. Both the mercantile firm and the individual bankrupt were in a state of deep, and so far as appears, irretrievable insolvency, and there is no reason to doubt the bankrupt knew these facts. Though a competent witness for the appellants on the question of his own intent, and able to give decisive evidence, if believed, he has not been examined, nor is there any evidence in the record to control the strong presumption that the purpose he executed on the 22d of May, by filing his petition, existed in his mind fifty days before, when his circumstances were the same, and the inducements to take advantage of the act were is great, as at the time he actually attempted to do so.

It is true the appellants say in their answers they did not know or believe, when the power was given, and do not now believe, the debtor then contemplated bankruptcy. But their answer, though responsive, in this particular, to the bill, is entitled to little weight concerning the state of mind of the debtor, no reasons being given for their belief and none of the facts explained

from which an opposite inference is to be drawn, 9 Cranch 160; and their own state of mind is not material, because the petition was filed within two months after the date of the power.

It has been suggested that the execution of the power of attorney by Mahard was in itself an act of bankruptcy, because he thereby procured his goods to be taken on execution. But the act requires that this should be done willingly, or fraudulently. The Buckinghams being *bonâ fide* creditors there is no ground upon which this act can be deemed fraudulent unless it was done in contemplation of bankruptcy and with intent to give a preference, and this would bring us back to the inquiry whether such contemplation and intent existed; and it is explicitly denied by the answers of the Buckinghams that the power was executed by Mahard willingly, it having been done under strong pressure by them, and only at last because a suit was threatened if he did not comply. There is no evidence to control these statements in their answers, so that we cannot say that *per se* the giving of the power was an act of bankruptcy. 1 Deacon's B. L. 446; Thompson *v.* Freeman, 1 T. R. 155; Hunt *v.* Mortimer, 10 B. & C. 44; Morgan *v.* Brundrett, 5 B. & Ad. 297.

We have therefore found it necessary to go into the inquiry whether the bankrupt did in fact contemplate bankruptcy when the power was given, and intend to give a preference thereby; and being of opinion that he did, there is no error in the decree of the Circuit Court in this particular.

The third objection made to the decree of the court below is, that it established the validity of sundry mortgages on the property of the bankrupts, held by certain banking corporations. It is alleged by the appellants that these mortgages were void, on account of usury; that though, by the statute law of Ohio, a usurious contract is valid, for the principal sum lent, with lawful interest thereon, yet, if a banking corporation make a usurious contract, it is utterly void, because such a banking corporation has no lawful authority to make such a contract, exceeds its powers by attempting to do so, and consequently neither party is bound thereby.

We have not thought it necessary to examine this position, because we are of opinion that usury, in either of these mortgages, is not proved.

The power of these banking corporations to deal in exchange is not controverted. There is no usury on the face of any one of these transactions. It is incumbent on the party who charges usury to prove it; and where it is alleged to consist in taking excessive rates of exchange, or in resorting to the form of a bill of exchange in order to keep out of sight a usurious compensation for the simple loan of money, these facts must be proved.

Andrews *v.* Pond et al. 13 Pet. 65; Creed *v.* The Commercial Bank, 11 Ohio R. 489. The answer of each bank denies such intent, and avers that the exchange charged in each case was the customary and regular rate at the time of the discount of each bill. There is not evidence to prove the contrary. Indeed it was agreed by the counsel on both sides, during the argument, that the rates charged were the usual and customary prices of exchange between Cincinnati, where the bills were drawn, and New Orleans, where they were payable, at the times they were discounted. The counsel for the appellants urged that the rates were higher than were charged on sight bills. But these were time bills, and it is no proof of usury that the banks did not take the market rates on sight bills which they did not discount, if they took only the market rates on those they did discount. It was also insisted that the banks did not buy these bills, but were the first takers for loans of money made to the drawers. But we are unable to perceive how the fact that the banks were the first takers can be of any importance in this case, nor do we deem it material that the bills were discounted for the drawers.

The reason why the addition of the current rate of exchange to the legal rate of interest does not constitute usury is, that the former is a just and lawful compensation for receiving payment at a place where the money is expected *to be less* valuable than at the place where it is advanced and lent. And this reason exists when the lender discounts the drawer's bill as well as when he buys a bill in the market of the payee. In neither case is it usury to take the regular and customary compensation for the loss in value by change of place of payment. It is argued that no usage, or custom can make an unlawful contract valid. This must be admitted. But the contract is not unlawful, unless more than six per cent. has been reserved or taken for interest; if more has been reserved or taken, not for the loan and forbearance, but for a change in the place of payment, then the contract is lawful; and in determining whether the excess over six per cent. has been reserved for interest, or as a just compensation for changing the place of payment, the custom, or the market value of this change, is *evidence of the real intent of the parties,* and so evidence of the validity of the contract.

Our opinion is that usury was not made out in either of these mortgages and that there was no error in the decree of the court below declaring their validity. The decree of the Circuit Court is affirmed with costs.

*Order.*

This cause came on to be heard on the transcript of the record from the Circuit court of the United States for the District

of Ohio, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court in this cause, be, and the same is hereby affirmed with costs.