## In re KENYON.

### (District Court, N. D. Iowa, E. D. January 4, 1902.)

BANKRUPTCY—DISCHARGE—FAILURE TO KEEP PROPER BOOKS.

    A merchant, who had been in business for years, and had established a good reputation with wholesale houses, sold out his business, and shortly afterwards opened a business in another place, purchasing goods to the amount of about $6,000 on credit, on the strength of his previous reputation; a statement made by him a short time previously having shown him to be worth $20,000. In fact, he had no property except $500 in cash, and was indebted nearly $6,000, and within three months filed a petition in voluntary bankruptcy. The books kept by him in the store failed to show his actual financial condition, or the amount of cash received or paid out, and contained nothing except the accounts for goods purchased on credit, with the payments made thereon. *Held* that, in view of his business experience, and his hopelessly insolvent condition when he opened the business, which rendered every payment to a creditor an act of bankruptcy, his failure to keep books showing his true condition must be regarded as having been with fraudulent intent, and in contemplation of bankruptcy, and on that ground his discharge should be refused.

In Bankruptcy. On application for discharge, and objections thereto.

E. E. Hasner, for bankrupt.

Henderson, Hurd, Lenehan & Kiesel, for opposing creditors.

SHIRAS, District Judge. From the record submitted in this case it appears that specifications in opposition to the petition for discharge were duly filed on behalf of certain creditors, the first ground thereof being the charge that the bankrupt, with fraudulent intent to conceal his true financial condition, and in contemplation of bankruptcy, had failed to keep books of account or records from which his true condition might be ascertained. The evidence shows

that the bankrupt had been engaged for years in the mercantile business, having stores at Lamont and other towns, before he entered into business at Elma, Iowa; and he had such familiarity with business transactions that he must have known the need of keeping reasonably accurate books of account, if he purposed, by so doing, to keep track of his actual business condition. His own testimony shows that the books kept by him at Elma wholly failed to show his true financial condition. They showed the goods bought on credit from various houses, and the moneys paid them on account, but did not show the sums due the bankrupt for goods sold on credit, nor the amounts received in cash for goods sold, nor the disposition of the cash received; nor did they show the indebtedness due from the bankrupt for money borrowed, nor the indebtedness remaining unpaid growing out of the business conducted by the bankrupt at Lamont and other points, before he removed to Elma. In other words, if any person had relied upon the showing made by the books as evidence of the actual financial condition of the bankrupt, he would have been wholly misled thereby, and it is the fact that these books did not show the actual financial condition of the bankrupt. To determine the intent of the bankrupt in this particular, regard must be had to what the evidence discloses touching his past history as a business man, and what the facts were surrounding him when he opened the store at Elma, which was in April, 1900. For some years prior to that time the bankrupt conducted a general mercantile business at Lamont, Iowa, having a branch store at Aurora, and had so conducted the same that he had stood in good credit with those with whom he dealt. During the year 1899 and early part of 1900 his relations with a clerk in his employ became such as to cause a separation between himself and his wife, and resulted in the breaking up of the business conducted at Lamont. The wife claimed that some $3,000 or more of money coming to her from her father's estate had been invested in the business under a promise that it should be repaid her when so demanded, and it appears that she had given much of her personal time and services in aid of the business conducted in her husband's name. In February, 1900, the bankrupt traded the stock of merchandise to Arthur Hunt, taking in exchange therefor 160 acres of land in Woodbury county, which was subject to a mortgage of $2,500. The land was taken at a valuation of $50 per acre, making $8,000 in all, leaving a net value of $5,500 after deducting the mortgage; and, in addition thereto, Hunt agreed to pay $3,000 in cash. A settlement was reached between the bankrupt and his wife, whereby the 160 acres were deeded by Hunt to her, she assuming the payment of the mortgage thereon, and also the payment of a sum due Carson, Pirie, Scott & Co., of Chicago, evidenced by a note signed by the husband and wife, and the bankrupt executed to her his note for $1,500. Out of the cash paid by Hunt to the bankrupt, amounting to $2,700 according to the testimony of the bankrupt, the latter paid to various creditors sums aggregating $2,163.71. About April 1, 1900, he opened out a store at Elma, being accompanied to that place by the clerk that had brought about the separation be-

tween the bankrupt and his wife and the dissolution of the business at Lamont, and her father. According to the statement of the bankrupt at this time, his financial condition was substantially as follows: He owed his wife $1,500, evidenced by a note held by her; he owed D. A. Sheffield $1,900 for money borrowed, and evidenced by four promissory notes; he owed the Lamont Savings Bank about $2,000; to Carson, Pirie, Scott & Co. about $1,700; to Watt Bros., $92.10; to ———— Moore, $172.74; to Beals & Torry, $200; and to C. P. Kellogg & Co., $285. The debt due the Lamont Savings Bank was secured by a mortgage on property in Earlville and Lamont, and Carson, Pirie, Scott & Co. had a second mortgage on the same property. Under the evidence it is making a liberal allowance for the value of the security to hold that it would pay the debt due the bank, but, making this deduction, the indebtedness acknowledged to be due from the bankrupt when he went to Elma amounts to the sum of $5,849, and all the assets he had left him was the cash he took with him, amounting to less than $500. Taking advantage of the credit he had acquired with the houses from whom he had previously bought goods,—a credit sustained by written statements furnished these wholesale houses, one at least being as late as January 27, 1900, wherein he claimed to be worth nearly $20,000 over and above all indebtedness,—the bankrupt bought on credit goods to the value of more than $6,000, and opened out therewith a store in Elma. When these purchases were made, the bankrupt knew his absolutely insolvent condition. He knew that all the property left remaining him was the small amount of cash he had on hand, which would be rapidly absorbed in the expenses attending the opening of the store at Elma. He knew that he then owed nearly $6,000, and he must have known that it was absolutely impossible for him to ever pay the indebtedness he was thus creating, in view of his existing hopelessly insolvent condition. He knew that his condition had changed in every respect, and yet, in effect, he asked the houses from whom he bought the goods to deal with him as though his actual condition remained unchanged. These parties undoubtedly dealt with him on the faith of the credit he had established when in business at Lamont, and it was unquestionably a fraud upon the part of the bankrupt to make the purchases on credit of the goods shipped to him at Elma, knowing that he was wholly without ability to meet the demands he thus created. The whole past history of the bankrupt, as outlined in the evidence, shows clearly that he was too able a business man to entertain the belief that he could successfully carry on the business he opened out at Elma, and he must have known that his career at Elma would be brought to a close as soon as his creditors understood the actual situation of his affairs. The business at Elma was opened about April 1, 1900, and the voluntary petition in bankruptcy was sworn to on June 15, and was filed on June 23, 1900. It was brought about at this particular time by the action of C. P. Kellogg & Co. in replevying certain goods on the ground that they had been misled in the sale thereof on credit. The bankrupt realized that this fact, becoming known, would lead to an investigation

of his affairs by the other creditors, and he met the situation by going into bankruptcy. His action in this direction justifies the conclusion that he must have contemplated such a result when he opened the store at Elma. The condition of his affairs was such that he knew that any payments made to a creditor would be a preference, as he was in fact and to his own knowledge hopelessly insolvent; and he knew, therefore, that he was committing acts of bankruptcy which would sustain a creditors' petition against him when he made payments to any of his creditors. In construing the words "in contemplation of bankruptcy," used in the act of 1867, the supreme court, in Buckingham v. McLean, 13 How. 151, 14 L. Ed. 91, held that "the debtor must have contemplated an act of bankruptcy, or an application by himself to be decreed a bankrupt," in order to avoid a security given when insolvent. In the case now under consideration the bankrupt not only contemplated acts which, when done, would enable creditors to sustain a charge of bankruptcy against him, but he in fact committed the acts, in that, being insolvent, he transferred money to a portion of his creditors, thereby preferring them; and, furthermore, as soon as it was apparent that his creditors were becoming aware of his actual condition, he himself filed his voluntary petition in bankruptcy. These facts justify the conclusion that in opening out the business at Elma he did so in contemplation of bankruptcy, and with the intent to go into bankruptcy as soon as his creditors began to inquire into his condition; and also justify the conclusion that his failure to keep proper books of account was part of the general scheme to fraudulently buy on credit goods to be used in the business at Elma, which were to be sold as far as possible for cash only, and, when it was apparent that the creditors could not be much longer deceived, then to wind up the business by going into bankruptcy. Under these circumstances it cannot be expected that the court will aid him in carrying through his fraudulent purpose by now granting him a discharge, and releasing him from liability for debts thus created, but, on the contrary, the petition for discharge will be refused on the ground that it is proven that the bankrupt, with intent to defraud, and in contemplation of bankruptcy, failed to keep proper books of account from which his true financial condition could be ascertained.