628 213 FEDERAL REPORTER

bankrupt shall not receive a discharge if he has made a materially false statement in writing for the purpose of obtaining credit.

In June, 1911, this bankrupt made a statement for the purpose of obtaining credit, in which he stated that his stock, at cash price, was worth $7,000 and was insured for $5,500. He also stated that he had $100 cash on hand and that his liabilities on open account were $2,500 and that he owed for borrowed money $250.

The commissioner finds that at this time he owed his father about $10,000 and to other relatives sums aggregating over $2,000. In other words, he was hopelessly insolvent and could not have paid his creditors 50 cents on the dollar. How can we overlook so plain a case of false representations? Were not those who were asked to extend credit to the bankrupt entitled to know that he owed $12,000 to his relatives? Is it likely that any one would have extended credit had he known that the bankrupt was insolvent to the extent of $7,000? There is no doubt that the bankrupt made a materially false statement for the purpose of obtaining credit. The moment this was done the bar to a discharge, if the creditors chose to assert it, was absolute. The bankrupt had done an act which prevented his obtaining a discharge. The fact that two years afterwards these debts had been paid or released or that when the statement was made the bankrupt believed that the relatives to whom he owed money would not press him for payment in no way mitigates the falsity of the statement when it was made.

Being convinced that the statement of June 9, 1911, which was given to obtain credit, was materially false, we think the discharge should be refused.

The order granting the discharge is reversed with costs.

---

### In re BAAR.

(Circuit Court of Appeals, Second Circuit. April 7, 1914.)

#### No. 214.

BANKRUPTCY (§§ 181, 188*)—CHATTEL MORTGAGES—VALIDITY—FRAUD.

Where a chattel mortgage, executed by a mortgagor subsequently adjudged a bankrupt, was valid under the laws of the state where made, because duly filed, it was good as against the trustee in bankruptcy, under Bankr. Act July 1, 1898, c. 541, § 67 (d), 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), unless it was given and accepted with intent to hinder, delay, and defraud creditors, and the mere fact that the mortgagee, giving full consideration, knew or stipulated that part of the proceeds of the loan should be applied to relieve a corporation of which he was president and a relative of liability as accommodation indorsers on the notes of the bankrupt, did not invalidate the mortgage, though a preference resulted, because of want of actual fraud on the part of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 270, 271, 273, 274, 286–289, 291–295; Dec. Dig. §§ 181, 188.*]

Appeal from the District Court of the United States for the Eastern District of New York.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the matter of bankruptcy proceedings of Jacob Baar, bankrupt. From an order adjudging void a chattel mortgage executed by the bankrupt to Solomon Baar, the latter appeals. Reversed.

D. C. Myers, of New York City, for appellant.
H. C. Glore, of Brooklyn, N. Y., for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. Jacob Baar, the bankrupt, had carried on for many years the fat rendering business under the name of the Long Island Soap Works. On or about July 3, 1912, Baar Bros., Incorporated, of which his brother Solomon Baar was president, had indorsed as an accommodation two of the bankrupt's notes, each for $250, one due September 3, and the other October 3, 1912, which were discounted by the Greenpoint National Bank. The bankrupt had also discounted his note for $500, indorsed by his son Sigmund, due August 9, 1912, in the Broadway Bank of Brooklyn, and another for $1,000, indorsed by his son, due September 26, 1912, in the Greenpoint National Bank.

August 3, 1912, being in financial straits, he applied to his brother Solomon for a loan of $2,500, to be secured by a chattel mortgage on the horses, wagons, tools, and machinery used in his business. The special commissioner and the District Judge have found that Solomon Baar stipulated that the loan should be applied in payment of the notes aforesaid and that he knew Jacob was in financial difficulties. The chattel mortgage was duly recorded on that day, the $2,500 paid over, and some $2,000 of it went to take up the notes in bank before their maturity.

September 17th, an involuntary petition in bankruptcy was filed, and subsequently Jacob Baar was adjudicated a bankrupt. The trustee obtained an order upon Solomon Baar to show cause why the chattel mortgage should not be declared null and void against creditors, because made within four months of the filing of the petition and with the intent of hindering, delaying, and defrauding creditors. Solomon Baar submitted to the jurisdiction of the court, and it was so proceeded that the mortgage was declared null and void. This appeal is from that order.

The mortgage was valid under the law of the state of New York against creditors, because it was duly filed in accordance with article 10 of the Lien Law (Consol. Laws N. Y. c. 33). As such it is good against the trustee in bankruptcy under section 67 (d) of the Bankruptcy Act, unless it was not accepted in good faith or was in fraud of the act. It could not be set aside under section 67 (e) unless it was given and accepted with the intent of hindering, delaying, and defrauding creditors. Solomon Baar gave a full present consideration. If he knew or even stipulated that part of the proceeds of the loan should be applied to relieve the corporation of which he was president and his nephew of liability as accommodation indorsers on the bankrupt's notes, there was nothing fraudulent in that. The payment was a preference of the banks, and so of the indorsers; but the bankrupt had at common law and under the statute of Elizabeth a right to prefer any

bona fide creditor. The trustee could recover the payments under section 60, if the banks received them having reasonable cause to believe that they were intended as preferences; but to invalidate the mortgage under section 67 (e) a preference is not sufficient. Actual fraud on the bankrupt's part must be shown. Van Iderstine v. National Discount Co., 174 Fed. 518, 98 C. C. A. 300; Coder v. Arts, 213 U. S. 223, 241, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008.

No such fraud being shown, the order is reversed.

---

## THE BERN.

### (Circuit Court of Appeals, Second Circuit. March 10, 1914.)

### Nos. 185, 186.

TOWAGE (§ 11*)—INJURY TO TOW BY FLOATING ICE—LIABILITY OF TUG.

A tug, which started across the Hudson river in the daytime with a coal laden barge in tow alongside projecting ahead, *held* liable for injury to the barge by floating ice on the ground that when the ice was seen she should have placed the barge behind her on a hawser, instead of which she used it to push a way through the ice.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

Appeals from the District Court of the United States for the Southern District of New York.

Suits in admiralty by Bernard McLain and by the W. C. Mason Company against the steam tug Bern; the Philadelphia & Reading Railway Company, claimant. Decrees for libelants, and respondent appeals. Affirmed.

The following is the opinion of the District Court by Hough, District Judge:

Admittedly the Bern took libelant's barge through heavy ice, and, since it was broad daylight, it was well known that the towage was to be of this nature.

This statement about heavy ice is taken from the Bern's report to the local inspectors. Admittedly, the tug went at slow speed, and according to her engineer, stopped two or three times before the barge began to leak. This is corroboration, not only of the heaviness of the ice, but of the expected difficulties of navigation.

The engine was also backed, although there was no vessel in the neighborhood requiring this manœuvre. Why the engine was backed is explained by the deck hand, who says that "we backed to let the bow get easy into the ice" (this means the bow of the barge).

The result is that a very powerful tug of some 600 horse power, 113 feet long by 29 feet beam, and drawing 13 feet, used a laden scow as a ram with which to push through very heavy ice. The natural inquiry is: Why was not the barge put astern and the tugboat used to clear the ice?

The master of the tug gave his theory on this matter, expressing the opinion that, owing to the distance between his towing bitts and the stern of his tug, any tow astern, even on the shortest of hawsers, would sheer and yaw, and be quite as much exposed to injury by ice as if her bow were sticking out ahead.

In the first place, this explanation will not stand mathematical tests, and, in the second place, I do not think it is the true explanation; for the master

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes