### QUINN v. UNION NAT. BANK OF ROCHESTER, MINN.

### In re EWERT.

Circuit Court of Appeals, Eighth Circuit.
April 9, 1929.

### No. 7832.

See, also, 28 F.(2d) 270; 32 F.(2d) 772.

Howard G. Fuller, of Pierre, S. D. (Fuller & Robinson and Martens & Goldsmith, all of Pierre, S. D., on the brief), for appellant.

Chambers Kellar, of Lead, S. D. (Gardner & Churchill, of Huron, S. D., and Sutherland, Payne & Linstad and McNamee, O'Keeffe & Stephens, all of Pierre, S. D., on the brief), for appellees.

Before STONE and KENYON, Circuit Judges, and JOHNSON, District Judge.

KENYON, Circuit Judge. This is an appeal by a trustee in bankruptcy from a judgment and decree entered on March 10, 1927, by the District Court of the United States for the District of South Dakota, holding valid certain mortgages to the amount of $39,500, given by one Ewert, subsequently adjudged a bankrupt, to his attorneys (appellees) as security for a promised fee of $25,000. The matter had been heard before a referee, who rendered a decision allowing compensation to the attorneys from the property of the bankrupt to the extent of $600 for services rendered up to the time a petition in bankruptcy was filed, and holding void said mortgages.

We are presented with a situation where the referee held one way and the trial court another, and it is insisted by appellees that the trial court by its findings of fact and its decree has decided controverted questions of fact, and that this court will not disturb such findings.

It is the rule of this circuit that "when a court of equity has considered conflicting evidence, and made a finding and decree, it is presumptively correct, and, unless some obvious error of law has intervened or some serious mistake of fact has been made, the finding or decree must be permitted to stand." State of Iowa v. Carr, 191 F. 257; Harper v. Taylor, 193 F. 944; Silver King Coalition Mines Co. v. Silver King C. M. Co., 204 F. 166, Ann. Cas. 1918B, 571.

The trial court here made findings of fact contrary to the conclusions of fact of the referee. The witnesses were not before it, but were before the referee. This court has the benefit of the same record that the trial court had. Whatever presumption there may be of correctness as to the conclusions of fact of the trial court must be very slight under such circumstances. Further, the trial court stated in its opinion that there was no dispute as to the evidence. We are satisfied there is no substantial controversy as to the facts. In view of the evidence not being conflicting we think the findings of the trial court are in no way binding upon us; that the case is open for full consideration, and it is our duty to determine from the record whether the facts as established justified the conclusion of the trial court.

Adolph W. Ewert was a resident of South Dakota, and for more than seven years prior to February 4, 1925, was treasurer of the rural credit board of that state, and president of the National Bank of Commerce of Pierre. He also was engaged in farming, and to a limited extent in the real estate business. As treasurer of the rural credit board he had handled large sums of money, and apparently in the latter part of 1924 and the early part of 1925 much discontent had developed in the state concerning his work as treasurer of said board. The successful candidate for governor had made the matter an issue in his campaign, and had said in his

campaign speeches that if elected he intended to remove Ewert as treasurer of the rural credit board. Large sums of rural credit money were deposited in the National Bank of Commerce, exceeding the amount allowed by law to be so deposited. The state Legislature passed a resolution calling for an investigation of the rural credit board, and on February 4, 1925, Ewert was subpœnaed to appear before an investigating committee appointed by the Legislature and to produce the records of his office. He did not respond to that subpœna and was immediately removed from office by the Governor and ordered to pay over to the state the rural credit funds. On the 4th day of February, 1925, the National Bank of Commerce suspended business and was taken over by the representatives of the Comptroller of the Currency of the United States. February 5, 1925, Ewert was cited before the Legislature for contempt because of his refusal to produce before the investigating committee the records asked for in the subpœna. He was adjudged in contempt and ordered into custody. On the same day he applied to the state court for a writ of habeas corpus, and was released from custody under said contempt proceedings; appellees O'Keeffe and Sutherland appearing for him. February 7, 1925, he was arrested on a charge of violation of the National Banking Act, and gave bail for appearance in the United States court. February 9, he was cited before the Supreme Court to show cause why he should not be adjudged in contempt of said court for violation of the court's decree relative to the disposition of funds of the rural credit board. February 16th he was adjudged by the Supreme Court in contempt and sentenced to jail for 90 days and to pay a fine of $500. On February 10, 1925, appellees Gardner, O'Keeffe, and Sutherland entered into an agreement with Ewert, the exact terms of which are not entirely clear, but under which these attorneys "agreed to render legal services as attorneys for said Adolph W. Ewert in the defence of such criminal or civil actions and proceedings then pending, or that might thereafter be brought and prosecuted against him in connection, or arising from, his acts, transactions, doings and dealings as Treasurer of the South Dakota Rural Credit Board and as an officer, director or stockholder of said National Bank of Commerce of Pierre, South Dakota, for the agreed compensation of $25,000."

To secure the fees eight mortgages dated from February 7, 1925, to March 3, 1925, were given by Ewert on real estate and personal property covering his interest in certain lands, town lots, and cattle, horses, and machinery, to the amount of $39,500. Certain of the mortgages were given to third parties and filed in the offices of the registrars of deeds in the county in which the respective property was situated. The mortgages that ran directly to the attorneys were not placed on record until some months after they were executed, and were not filed until after the bankruptcy proceedings had been instituted. One of the mortgages was made to the Union National Bank of Rochester, Minn.; one to L. P. Wilson of Woodbury county, Iowa; one to the Dakota Savings & Loan Company of Huron; one to R. J. Jackson, and one to R. J. Barnett; one to D. J. O'Keeffe; and two to A. K. Gardner and D. J. O'Keeffe, appellees. In addition thereto he turned over other collateral to the attorneys, being notes of one Quackenbush in the amount of $2,600, on which he later collected $650 and used the money without the knowledge of appellees.

On March 21, 1925, a petition in involuntary bankruptcy was filed against Ewert, and on December 14, 1925, he was adjudged a bankrupt. After the contract was made appellee attorneys appeared in a habeas corpus proceeding in the United States District Court in a garnishment suit, and in the matter of a complaint charging him with embezzlement of over $296,000. In November, 1925, an indictment was found charging him with the embezzlement of over $211,000. At the October term, 1925, of the United States District Court, the grand jury returned an indictment of 38 counts charging him with misapplication of the money of the National Bank of Commerce. The embezzlement case was tried in 1926, and the trial court occupied a month's time.

Appellee, Sutherland, had been a personal adviser of Ewert for more than 25 years. Other appellees, Gardner and O'Keeffe, had not been previously employed by Ewert in any matters. There is testimony that the attorneys, who were all personally acquainted with Ewert, believed him to be a man of considerable wealth.

The trustee testified that the estate at the time the contract with appellees was entered into would not exceed $10,000 in value exclusive of secured claims and the value of property covered by the mortgages in dispute. At the time the contract was entered into there were criminal matters pending or threatened against Ewert. He was a stockholder in the bank which had failed to the amount of $30,000, and was under the law liable for an assessment thereon. At the time

of the referee's decision claims to the amount of over $89,000 had been filed and allowed in his estate. The state of South Dakota filed claim to the amount of $873,286.43. This had not been allowed at the time of the hearing before the referee.

About the time of the passage of the resolution in the state Legislature to investigate the rural credit board, Ewert made a deed of his residence property in the city of Pierre to his wife. This property had cost approximately $30,000. He also made certain deeds to his father. January 8, 1925, he gave the First State Bank of Onida, S. D., of which he was an officer, a real estate mortgage to secure the payment of $4,580.78. When the bank, of which he was president, suspended operations, he was indebted to it in the sum of $10,000. On the morning of that date he was overdrawn $3,000, and his personal account at the bank had been overdrawn for some time. An assessment of 100 per cent. on the stock of this bank was later made. He had a salary of $2,000 as treasurer of the rural credit board, and $3,600 as president of the bank. These were terminated on February 4, 1925. He was indebted to his hired men and for stock feed in the amount of $3,000. On the 7th of February, 1925, he made two mortgages, one payable to L. J. Thorpe, as trustee, for the benefit of the hired men on the farm in the sum of $3,000. The other was made payable to appellee O'Keeffe in the sum of $3,000. These mortgages were taken by Thorpe to Onida, the county seat, for record. There is some dispute as to just what Ewert stated to Thorpe at the time of executing and sending these mortgages on for record. In February or March, 1925, he reduced his stock down to twenty odd head of cattle. The cattle covered by the mortgages to Thorpe and O'Keeffe were covered by a fourth mortgage of $7,000 to one Wilson, which mortgage is involved in this controversy. About February 7th Ewert directed Thorpe to ship a carload of cattle in the name of William Born, who was his foreman. Born was to get cash for the cattle and bring the same to Ewert. The proceeds of this shipment were about $1,700, which was returned to Ewert in cash. Ewert was unable to make cash payment to his attorneys, but secured them in the manner pointed out.

The mortgage to the Union National Bank of Rochester, Minn., was a first mortgage on a quarter section which was clear, and this was in the amount of $6,000. Appellee attorneys were to protect the said Union National Bank in its purchase of the mortgage. This bank is a party to this case.

Another mortgage was taken in the name of the Dakota Savings & Loan Company of Huron in the sum of $4,500, which was later assigned to Bertha Denton of Oregon. She is also a party here. Both of these parties are represented by the same attorneys as the bankrupt, and their interests are evidently protected in case of adverse decision as to the appellee attorneys.

Appellant as trustee for the bankrupt filed application before the referee for a re-examination of the transaction for payment of attorneys' fees, and asked cancellation of the mortgages as made by Ewert to them as "in contemplation of bankruptcy." The referee proceeded under section 60d of the Bankruptcy Act (11 USCA § 96(d) which provides as follows: "If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty for services to be rendered, the transaction shall be re-examined by the court on petition of the trustee or any creditor and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate," and contemplates summary jurisdiction. It is the purpose of section 60d of the Bankruptcy Act to permit a party to secure the services of attorneys to be rendered in connection with the bankruptcy proceedings, and said subdivision d relates to services germane to the bankruptcy proceedings. Pratt v. Bothe (C. C. A.) 130 F. 670; In re Habegger (C. C. A.) 139 F. 623, 3 Ann. Cas. 276; Tripp v. Mitschrich (C. C. A.) 211 F. 424. An attorney's fee allowed under this section is neither a preference nor a fraudulent conveyance if payment is for services rendered in contemplation of bankruptcy. In re Wood and Henderson, 210 U. S. 246, 28 S. Ct. 621, 52 L. Ed. 1046; In re Rolnick (C. C. A.) 294 F. 817.

The test laid down by Judge Adams in Re Rosenthal & Lehman (D. C.) 120 F. 848, is whether or not the services are rendered in good faith for the purpose of administering the act in a way to carry out the purpose of its enactment. The referee found the services rendered prior to filing bankruptcy petition were of the value of $600, and allowed the same. There is no question raised throughout the case as to this. The referee held that Ewert gave the mortgages in contemplation of bankruptcy and that all the respondents (appellee attorneys) were fully advised as to the financial condition of the bankrupt.

He seems to have held that these liens created a preference and also hindered, delayed, and defrauded creditors. The trial court held that the liens were not created in contemplation of bankruptcy, and therefore there was no summary jurisdiction, but proceeded to determine all questions involved.

The bankruptcy court as a court of equity had general jurisdiction of all questions that might arise in the bankruptcy proceeding. It is without question that the property upon which the liens had been created was in the possession of the trustee at the time of trial.

Appellees waived any right to have their claims determined in a plenary action by assenting to having all matters tried in the summary proceeding. Certainly there was general jurisdiction in the bankruptcy court outside of section 60d (having taken possession of the property) to determine all controversies as to the extent, character, and validity of the liens claimed to have been created. Whitney v. Wenman, 198 U. S. 539, 25 S. Ct. 778, 49 L. Ed. 1157; Murphy v. John Hofman Co., 211 U. S. 562, 29 S. Ct. 154, 53 L. Ed. 327; Babbitt v. Dutcher, 216 U. S. 102, 30 S. Ct. 372, 54 L. Ed. 402, 17 Ann. Cas. 969; Hebert v. Crawford, 228 U. S. 204, 33 S. Ct. 484, 57 L. Ed. 800; Britton v. Western Iowa Co. (C. C. A.) 9 F.(2d) 488, 45 A. L. R. 711. This is not questioned on this appeal.

The trial court's finding was that there was practically no dispute in the testimony; that the mortgages involved were not given by Ewert to his attorneys in contemplation of bankruptcy proceedings against him; that the transaction was in good faith, and was not a fraud on the creditors of Ewert, and that the promise of the attorneys to perform legal services in the future was a full present consideration for said mortgages, and that said mortgages were valid in the hands of appellees.

It is the contention of appellant that the trial court erred in all these findings, especially in holding as a matter of law that a promise for future legal services was a fair present consideration for mortgages aggregating $39,500, with additional collateral of $2,600; and in not holding that the transfers were fraudulent under the laws of South Dakota. It is argued that these mortgage liens are invalid under section 60b of the Bankruptcy Act (11 USCA § 96(b) as an unlawful preference, and also under 67e (11 USCA § 107(e), as a transfer to hinder, delay, and defraud creditors. There may be doubt as to whether section 60 applies to the situation here presented, as that section relates to pref-

erences and "preference implies paying or securing a pre-existing debt of the person preferred." Dean v. Davis, 242 U. S. 438, 443, 37 S. Ct. 130, 131 (61 L. Ed. 419). Preferences arise only in case of antecedent debts. Collier on Bankruptcy, p. 888. Whether the mortgages were given to secure any antecedent debt may be questioned. The mortgagees had not been creditors of Ewert prior to the time the mortgages were given, but as neither party raises this question we pass it by and assume the debt in question was such as to come within the purview of the preference statute. In any event the question of whether the act of Ewert in giving these mortgages was in contemplation of bankruptcy bears upon section 67d of the Bankruptcy Act hereinafter discussed.

Were the transfers (liens) created in contemplation of bankruptcy? This court considered the meaning of this expression in Tripp v. Mitschrich, 211 F. 424, 427, saying: "The words 'in contemplation of bankruptcy' refer to the state of mind of the debtor, not of the attorney. This results from an even casual reading of the section. But what is meant by contemplation? We are of opinion that as here used it means more than a simple consciousness of insolvency. As was said by Patteson, J., in Morgan v. Brundrett, 5 Barn. & Adolph. 297, cited in Jones v. Howland, 8 Metc. (Mass.) 377, 41 Am. Dec. 525: 'A man may be insolvent and yet not contemplate bankruptcy.' And in Buckingham v. McLean, 13 How. 151, 167 (14 L. Ed. [91] 90): 'He may contemplate insolvency and the breaking up of his business and yet not contemplate bankruptcy.' Contemplation thus means more than the knowledge that a bankruptcy proceeding either by or against the debtor is impending. It means that in making the transfer the debtor is influenced by the possibility or imminence of such a proceeding. There must be some relation as of cause and effect between knowledge of his condition and the transfer. The latter must to some extent at least be attributable to his financial condition. This may be illustrated by gifts in contemplation of death. Such are not simply gifts made in light of the possibility that one may soon die. They are made because of a consciousness of this fact. In the case both of contemplation of death and in contemplation of bankruptcy proceedings, the possibility in each case must be upon the mind as an element leading to the result, to wit, the transfer. In a case under section 60d the debtor must of course be confronted with the possibility of a bankruptcy proceeding. But there must be more. There

must be a transfer induced at least to some extent by such a situation."

We quote also from Hayden v. Chemical National Bank (C. C. A.) 84 F. 876, as follows: "A bank or a business concern may be considered to be acting in contemplation of insolvency when, in making some disposition of its assets, it is actuated by its knowledge of its insolvency. * * * An act done by a corporation in the ordinary and usual course of business, uninfluenced by the state of its affairs, cannot be said to have been done in contemplation of insolvency." See general discussion of the phrase in Buckingham et al. v. McLean, 13 How. 151, 166 (14 L. Ed. 91).

We are concerned only as to what was in the contemplation of Ewert. That controls the ultimate conclusion. Ewert did not contemplate filing a voluntary petition in bankruptcy. He resisted the bankruptcy proceedings when they were brought on the ground that he was chiefly engaged in farming. No one had threatened bankruptcy proceedings so far as the record shows, but that he was influenced by the possibility or imminence thereof is apparent we think under this record. He was hopelessly insolvent when the liens were created. The adjudication established his status as a bankrupt at the date of filing the petition March 21, 1925. The referee found he was insolvent on the 8th day of January, 1925. The evidence abundantly establishes that fact. Of course, a party may contemplate insolvency and not bankruptcy. Insolvency is however an important element bearing on contemplation of bankruptcy. If these liens in question were good, Ewert possessed property worth not to exceed $10,000 to apply on claims running into the hundreds of thousands of dollars. He was a man of wide affairs, familiar with business transactions. He must have known there was no way out; that his action in giving eight mortgages on his real and personal property to the extent of $39,500 in the condition of his affairs was absolutely certain to bring on bankruptcy proceedings; that his creditors would not stand idly by and permit the assets of his estate to be used for purposes of no benefit to the estate. It is true he apparently cared naught for his creditors. He sacrificed their rights and used assets that should have been applied to their debts in an endeavor to save himself. There is no evidence that he had other resources. He never obeyed the order of the referee to file his schedule in bankruptcy showing his creditors and his property, and his mind was primarily concerned with the threatened criminal transactions. He had so conducted his affairs that all branches of the state government are practically accused of attempting to persecute him. What was in the contemplation of Ewert as to bankruptcy is a question of mental condition to be determined from all the circumstances; that he testified that nothing regarding civil liability was considered in connection with the discussion as to the contract of employment is not at all controlling or even persuasive in the face of the circumstances showing that his action was certain to bring on such proceedings in the natural course of business events. It is to be noted that Ewert did not say in his somewhat evasive testimony that at the time of the transfers he had no thought of the probability of bankruptcy proceedings being brought against him. We take from the record this part of the examination of Ewert:

"On recross-examination by Mr. Fuller witness testified:

"That he was examined before the referee in bankruptcy on January 4th and 7th, 1926.

"Q. And on one of those occasions, you were asked the following question, were you not? 'Q. Was part of the arrangement and contract with your attorneys that they should represent you in bankruptcy proceedings?' and you answered that question, did you not, as follows: 'A. They were to serve in all and every way needed in connection with my requirements for legal services.' A. I don't recall the answer, I probably answered it in a general way something like that."

His mental idea as to the scope of employment of his attorneys is shown by the fact that when bankruptcy proceedings were commenced he took the notices to his attorneys and made no further arrangement for them to appear for him in said proceedings, assuming that such service was part of that contracted for. The attorneys' theory thereof is that they appeared as incidental to their contract. The manner in which he handled the mortgage to Thorpe; in which he sold the carload of cattle in the name of Born, having the check cashed at another town, and having the money brought to him at Pierre; the placing of a fourth mortgage on some of the cattle; his knowledge of excess deposits of the state by him in the bank of which he was president and in other banks; the failure of his bank; the knowledge of his liability for assessments on his stock; his express desire to protect Sutherland for $4,000 or $5,000 (which may account for the mortgages being given for $14,000 more than attorneys' fees)—show that he knew the financial end was near. To say that his ac-

tion under all these circumstances was not in contemplation of bankruptcy is to say that he did not intend the natural consequences of his acts and that his mental contemplations were different from those of the average and general run of mankind. There was more than a mere possibility of bankruptcy proceedings arising out of Ewert's financial condition. There was a practical certainty thereof, and he must have known it and made the transfers, induced somewhat by the situation in which he was placed. What he knew would occur he must have contemplated and intended. We are satisfied that the transfers (liens) were made in contemplation of bankruptcy, and that the finding of the referee on that question was correct. We refer to some decisions arising out of transactions somewhat similar.

In Slattery v. Dillon (C. C. A.) 17 F.(2d) 347, 349, speaking of an assignment for the benefit of creditors, the court said: "Such assignment itself was an act of bankruptcy the probable result of which—the filing of a petition against him—Read must have contemplated, especially in view of the fact of his immediate disappearance from Eugene."

In Dean v. Davis, 242 U. S. 438, 445, 37 S. Ct. 130, 132 (61 L. Ed. 419), the court said: "The lower courts were justified in concluding that he intended the necessary consequences of his act; that he willingly sacrificed his property and his other creditors to avert a threatened criminal prosecution; and that Dean, who, knowing the facts, cooperated in the bankrupt's fraudulent purpose, lacked the saving good faith."

In Re Habegger, 139 F. 623, 630 (3 Ann. Cas. 276), this court said: "If an insolvent, contemplating bankruptcy, transfers his property in payment of future legal services to be performed, not beneficial to his estate and which do not inure to the benefit of his creditors, why is such a transfer not a voidable preference or a fraudulent transfer under other provisions of the act, to the same extent as are other transfers of his property without present fair consideration. * * * In so far as the claim is made for legal services performed on behalf of the bankrupt in defending him from criminal prosecutions, such services were neither beneficial to the estate, nor are they in their nature such legal services as are contemplated by the terms of the bankruptcy act, or as may be compensated from the assets of the estate in the hands of the trustee as a preferred claim; and this, even though such services had been performed before the filing of petition of bankruptcy and the consequent transfer of the estate into the grasp of the court."

In Lovett v. Faircloth (C. C. A.) 10 F. (2d) 301, 303, the court said: "One is presumed to intend the natural consequences of his acts. A debtor, who knows he cannot pay his debts, who knows he is insolvent, and who makes a transfer of all his property for the purpose of making a preferential payment, commits an act of bankruptcy, and must know that proceedings in bankruptcy will probably be instituted against him. One who accepts a lien on such a debtor's property, and thus attempts to withdraw it from the reach of creditors, with full knowledge that the debtor is insolvent, is not acting in good faith toward the creditors who are discriminated against." See, also, Ball v. German Bank of Carroll County, Iowa et al. (C. C. A.) 187 F. 750.

Other questions have been determined by the trial court, and are argued here as affecting the validity of the mortgages. They arise under section 67, which provides in part:

"(d) Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall, to the extent of such present consideration only, not be affected by this act.

"(e) * * * all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act subsequent to the passage of this act and within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor, except as to purchasers in good faith and for a present fair consideration."

This section deals not with preferences, but with conveyances made within four months prior to filing petition in bankruptcy with intent to hinder, delay, or defraud creditors. There is a wide difference between this and section 60 relating to preferences. Fraud is not essential to a preferential transfer. Under 67e actual fraud is necessary to invalidate the transaction. It is the gist of an action therefor. Powell v. Gate City Bank (C. C. A.) 178 F. 609; McAtee v. Shade (C. C. A.) 185 F. 442; In re Baar (C. C. A.) 213 F. 628; Senft v. Lewis (C. C. A.) 239 F. 116; Coder v. Arts, 213 U. S, 223, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008. To set aside conveyances under section 67e there must be an actual intent to "hinder, delay, or defraud his creditors," and these words are used with relation to

transfers fraudulent at common law. In re Bloch et al. (C. C. A.) 142 F. 674. Transfers of the debtor within four months prior to the filing of petition in bankruptcy, with intent and purpose on his part "to hinder, delay, or defraud his creditors," etc., are null and void as against creditors of such debtor, except as to purchasers in good faith and for a present fair consideration.

Under section 67d liens given or accepted in good faith and not in contemplation of or in fraud upon the provisions of the Bankruptcy Act (11 USCA) and for a present consideration, and recorded according to law, are unaffected by the Bankruptcy Act "to the extent of such present consideration only." There is no special provision in this section as to attorneys' fees. They stand the same as any other transaction. Magee v. Fox (C. C. A.) 229 F. 395. If the transfers here were with the intent and purpose to hinder, delay, and defraud creditors, then they were void unless taken in good faith and for a present fair consideration, and, if so, to the extent of the present consideration only they were unaffected by the act. The Supreme Court in Dean v. Davis, 242 U. S. 438, 444, 37 S. Ct. 130, 131 (61 L. Ed. 419), said: "A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act 'hinders, delays, or defrauds creditors' within the meaning of section 67e."

In making the transfers, the necessary effect of which was to deprive creditors of the benefit of the Bankruptcy Act, Ewert hindered, delayed, and defrauded creditors within the meaning of section 67e, but this is not enough to invalidate the transfers under that section. If the appellee attorneys could be considered purchasers in good faith and did not know the fraudulent purpose of Ewert, the conveyances as to them would be safe, provided they paid a present fair consideration, only however to the extent of such present consideration. We do not feel it necessary to pass on the question of whether the circumstances were such as to put the attorneys on inquiry as to Ewert's fraudulent purposes as to his creditors, and we pass that, and therefore this discussion of section 67e is somewhat superfluous, as we assume for the purpose of the present discussion as to section 67d, without so deciding, that the liens created by the mortgages were given by Ewert and taken by the appellee attorneys in good faith and not in contemplation of bankruptcy. How stands the case then? The liens would be good to the extent of the present consideration only. Prior to June, 1910,

the words "to the extent of such present consideration only" were not in the act. Congress had a purpose in placing such amendment in the act, and that was evidently to make more difficult schemes to circumvent the act, and Congress emphasized that such transaction was good to the extent of such present consideration only, strictly limiting the same. This amendment cannot be brushed aside as of no consequence.

We inquire: What was the present consideration in the creation of these liens? What was the quid pro quo? What did appellees part with for the liens upon the property? Was the promise to perform legal services a fair present consideration for mortgages amounting to $39,500, with additional collateral of $2,600?

Remington on Bankruptcy, § 1314, refers to present consideration as follows:

" 'Present consideration' in this connection must be given a broader construction than it usually possesses. As the term is commonly used, it is interchangeable with 'valuable consideration.' Thus, for instance, the extension of time for the payment of a pre-existing debt is commonly held to be a present or 'valuable' consideration for a transfer based thereon. And well enough so when the debtor is solvent, for when he is solvent it makes no difference whether his liabilities are reduced or his assets increased—the net result is the same, for the payment of the debt is equivalent to an increase of his assets by just so much. But when a debtor becomes insolvent it is manifestly quite different—it makes a great difference then whether the transaction results in an increase of the common fund or merely in a reduction of the liabilities.

"So it is that by the term 'present consideration' as used in this connection in bankruptcy is meant not a reduction of liabilities, but an increase or exchange of assets; and thus a lien given merely to secure a pre-existing debt is not—even though not made nor accepted in contemplation of bankruptcy—a valid lien, but if given for money or property then and at that present time passing into the estate, it is valid, unless of course, it is affected by bad faith."

In Re Murcott Steel Products Co. (C. C. A.) 294 F. 84, 85, the court says: "We think the 'present consideration,' as used in the above quotation from the Bankruptcy Act, preserved liens given in good faith and for the moneys actually paid." As $1200.00 had been paid that was held to be the extent of the present consideration.

In Re Mobile Chair Mfg. Co. (D. C.) 245

F. 211, 213, the court said: "Such employment, therefore, was contingent, and not absolutely fixed and determined by the mortgage. I cannot, therefore, see that the attorney's fee is in any sense a *present* consideration, as provided by the amendment to the section. Congress having been so particular, not only to use 'to the extent of such present consideration,' but then added the additional term 'only,' to show beyond any peradventure that the words were put in as a strict limitation, and as such should be so construed. I therefore conclude that this lien did not secure the attorney's fee."

In Lake View State Bank v. Jones et al. (C. C. A.) 242 F. 821, it was held that the surrender of a valid lien is of itself a present consideration to the extent of the security released.

In Sullivan v. Myer, 137 Tenn. 412, 193 S. W. 124, the assignment involved was held to be a present consideration.

Mortgages given in good faith by way of continuing collateral are valid to the amount advanced before the petition in bankruptcy is filed. Collier on Bankruptcy (12th Ed.) 1056. Where an obligation is assumed upon a valid agreement that the bankrupt will execute a mortgage upon certain specific property, "to secure the assumed liability, a mortgage executed and delivered in pursuance of such agreement, within a reasonable time thereafter, is valid, and the liability assumed will be deemed a present consideration for the conveyance." In re Farmers' Supply Co. (D. C.) 170 F. 502, 507. See, also, on the general subject, Schilling v. Curran, 30 Mont. 370, 76 P. 998; In re Foster (D. C.) 181 F. 703; Robertson v. Hennochsberg (D. C.) 1 F.(2d) 604.

Counsel for appellees cite a number of cases, such as Thies v. Thies et al., 111 Neb. 805, 198 N. W. 151, in which it is held that an insolvent debtor has the right to employ attorneys to defend his estate and himself and to transfer his property in payment of such services, provided the transaction is in good faith and the fee does not exceed the services which might be reasonably anticipated. It is to be noted in that case that the mortgage was given in payment of services at that time performed.

In Yeiser v. Broadwell, 87 Neb. 583, 127 N. W. 886, the court refers to the Mosher Case (63 Neb. 130, 88 N. W. 552; 68 Neb. 713, 94 N. W. 1003, 100 N. W. 133), cited in appellees' brief, and says: "It is held that a creditor seeking to attack such a transfer should do so before services to the full value of the property are rendered."

In Reed v. Mellor, 5 Mo. App. 567, perhaps the strongest case on appellees' theory, in speaking of the attorney's employment to defend a prisoner, the court said: "It is manifest that this was no general employment for an indefinite period, to attend to any legal business which might at any time concern the prisoner. The employment had reference only to the difficulty of a criminal nature in which he was then involved, the precise nature of which does not fully appear."

In Gate City Nat. Bank v. Greene, 102 Kan. 202, 206, 170 P. 391, 393, the court said: "In this instance the employment was not a general employment to render whatever legal services might be required, in whatever litigation might arise in the future, as in the case of Shellabarger v. Mottin, 47 Kan. 451, 454, 28 P. 199, 27 Am. St. Rep. 306, or to render such services as the client and his relatives might need within the next two years, as in the case of National Bank v. Croco, 46 Kan. 629, 26 P. 942. The employment was to defend specific criminal actions pending at the time in a specific court. The need for the employment was instant, and for all the purposes of the law the services were due at once. The employer was not insolvent. She was not prohibited from making new engagements, and the attorneys simply became Mrs. Greene's creditors. They became creditors of equal rank with the plaintiff, and could take and hold security for their claim, if given in good faith and not as a ruse to hinder, delay, or defraud other creditors."

In Schlecht v. Schlecht, 168 Minn. 168, 209 N. W. 883, the words "present advance" as used in the Minnesota statutes, are referred to. The court says they have not as yet been defined, but that "enforceable promise, made at the time of the transfer of property, is a sufficient consideration within the meaning of the act, if the thing promised is not disproportionate to the value of the thing received," and it held that a fair consideration had been given. In considering state cases it must not be lost sight of that Congress strengthened the Bankruptcy Act to make liens good thereunder only to the extent of the present consideration.

In Shellabarger v. Mottin, 47 Kan. 451, 454, 28 P. 199, 200 (27 Am. St. Rep. 306), it is said: "It would be a fraud upon creditors to permit an insolvent debtor to place his property beyond their reach by transferring or conveying it to an attorney, or to some one for the benefit of the attorney, for future legal services, to be rendered in whatever litigation the debtor might thereafter be engaged."

27 Corpus Juris. p. 530, states the rule as follows: "So it has been held that a transfer of his property by a debtor to an attorney under a general agreement to render whatever legal remedies might be recovered in whatever litigation might arise thereafter, or a mortgage given by an insolvent debtor to his attorneys to secure fees for future services in sustaining an invalid mortgage secured by the firm creditors, is fraudulent and void as against creditors."

"It would be a fraud upon creditors to permit a debtor to place his property beyond their reach, by depositing it with an attorney to be held nominally for future services to be rendered in whatever litigation the debtor might be engaged. The attorney could hold it only to secure payment to himself for such services as he had, expressly or by implication, agreed to render before the creditor had established his lien." Crain v. Gould, 46 Ill. 293, 295. On general subject see Vanderlip v. Barnes, 101 Neb. 573, 163 N. W. 856; Morrell v. Miller, 28 Or. 354, 43 P. 490, 45 P. 246; Shideler v. Fisher, 13 Colo. App. 106, 57 P. 864.

It is well settled in the law that if a person conveys his property in consideration of an agreement to support him in the future, and this act makes him unable to pay his debts, the conveyance cannot stand as to existing creditors. The consideration is not a present one. See cases collected in extended note to 2 A. L. R. 1438; also Schmitz v. Wenzel, 166 Minn. 435, 208 N. W. 184.

We see no difference in the legal situation where a party transfers his property to a lawyer to defend him if certain contingencies arise and thereby renders himself unable to pay his debts, and where he transfers his property for future support, bringing about the same condition of insolvency.

In Re Rohnick (C. C. A.) 294 F. 817, 818, the court quotes with apparent approval from the opinion of the District Court (291 F. 766) as follows: "When the bankrupt pays money in return for an agreement to render legal services to him in future, he thereby acquires something of value in return for the money which he has paid, namely, the right to receive the services in question, and, in the event that they are refused, the right to sue and recover for breach of contract. It will not be suggested, I think, that on the eve of bankruptcy a prospective bankrupt could pay money to a physician and in return therefor receive an agreement whereby professional medical services would be performed in future, and it certainly cannot be contended that a bankrupt could pay over

to a dealer in merchandise on the eve of bankruptcy a sum of money and receive therefor an agreement (and acquiring the rights thereof), whereby at some future time merchandise was to be delivered to him."

We think the real test of present consideration in this case is whether or not the extent of the employment was fixed and determined, to be commenced and carried out in the immediate present, or whether it was a general employment to render indefinite legal services at some indefinite future time and based on some future contingency.

This leads us to consider what the contract between the parties really was. It was to render services in criminal or civil actions and proceedings pending, or that might be brought against Ewert in connection with his acts as treasurer of the rural credit board and from his connection with the National Bank of Commerce. The attorneys appeared for him in various civil actions, including the bankruptcy proceeding. It was not an employment merely in criminal cases as the trial court seemed to think. It was a general employment as to all matters civil and criminal that might arise as to him. The civil matters were interwoven with the criminal matters, as testified to by O'Keeffe. It could not be determined just what those matters would be. To say that one who is anticipating future trouble in the way of criminal actions or civil actions, and who may need the services of a lawyer, can make a transfer of his property just prior to bankruptcy proceedings and when he is in fact insolvent, and claim that there is a present consideration because of the promise of the attorneys to attend to these indefinite and uncertain legal procedures, is virtually to destroy the purpose of the Bankruptcy Law. It opens wide the door to unlimited fraud, and frustrates the very purpose of Congress in enacting the amendment of 1910. We think the present consideration here was the service performed by the attorneys from the time of the contract to the time of filing the petition in bankruptcy. That is what was parted with by them. That service has been found by the referee to be of the value of $600, and that is the extent to which the attorneys can be favored above the general creditors. The full performance of their agreement was interfered with by the bankruptcy proceedings.

In view of our conclusion that the liens were created in contemplation of bankruptcy, section 67d does not of course apply, but if we are in error in that conclusion, then the liens are protected under 67d only to the extent of the present consideration, i. e., the

services performed up to the filing of the petition in bankruptcy. That the order of the referee does, and the ultimate result is the same whatever theory is adopted.

We conclude that whatever view may be taken as to the applicability of section 60 or section 67, to the facts here appearing, the judgment and decree of the district court must be reversed, and it is so ordered.

Reversed and remanded.